**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**JACK HARDY**                                                                      **PLAINTIFF**

**v.**                                    **CAUSE NO. 3:09-CV-328-CWR-LRA**

**UNITED STATES OF AMERICA**                                   **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

From April 2 through 5, 2012, this Court held a bench trial on Jack Hardy's claims of medical negligence against the United States of America. Having considered the evidence and applicable law, the Court now issues its findings of fact and conclusions of law.

**I. Findings of Fact**

    **A. Breach**

        **1. The procedure and post-procedure monitoring**

On July 27, 2007, Hardy underwent a colonoscopy at the VA Medical Center in Jackson, Mississippi. During the procedure, Hardy's colon was swollen, with easily visible blood vessels beneath the mucosa.[1] Hardy's expert described this as abnormal and significant, in that a biopsy from this area would risk causing a hemorrhage. A biopsy was taken, though, resulting in a "massive hemorrhage."[2] Hellinger Tr. at 33.

The VA physicians attempted to stop the bleed by injecting the area with epinephrine, a hormone that causes blood vessels to constrict. The physician in charge, Dr. Maher Azzouz, thought epinephrine had effectively stopped the bleeding and concluded the procedure. Hardy was transferred into the Medical Intensive Care Unit (MICU). The physicians made a note in Hardy's chart saying that if the bleed continued, future providers should consider performing an angiogram or surgery.

---

[1] This was consistent with prior procedures. In May 2006, for example, a sigmoidoscopy revealed that Hardy's colon displayed friable, "inflamed, edematous, erythematous mucosa with what they called cobblestoning." Hellinger Tr. at 27. In plain English, that means Hardy's colon was swollen, red, would bleed easily, and looked like a cobblestone street.

[2] This fact alone does not indicate negligence; biopsies of abnormal areas can discover potentially precancerous cells. As will be explained, however, the VA team neither stopped the bleeding nor adequately observed Hardy for ongoing bleeding.

Hardy, however, continued to bleed. In the MICU, Hardy's hematocrit level did not improve, his blood pressure was "marginal to low,"[3] and his bowel movements displayed fresh red blood. *Id.* at 49-50. Yet the VA team did not measure Hardy's urine output, which is an "extremely important" measure used to determine whether a patient continues to bleed.[4] *Id.* at 50. It simply replaced the blood Hardy was losing.[5] Two days passed.

On July 29, with the bleeding and bloody bowel movements continuing, Hardy was taken for a repeat colonoscopy. VA doctors attempted to stop the bleeding using hemoclips but were unsuccessful; by that point, Hardy's colon was too inflamed. Hardy was then taken into emergency surgery for a hemicolectomy – removal of half his colon. An ileostomy was also conducted to route the flow of stool to an exterior bag.[6]

The standard of care for bleeds occurring during a colonoscopy calls for a durable approach that permanently stops the bleed. The VA team failed to meet that standard. For this bleed, they should have used a combination of epinephrine and hemoclips to stop Hardy's hemorrhage, instead of the temporary fix of epinephrine alone.[7] The physicians' belief that epinephrine had stopped the bleed by itself was not adequate.

The VA team separately erred when it let Hardy bleed for approximately 48 hours before deciding to intervene. The medical staff failed to measure Hardy's urine output and failed to recognize the import of his fresh bloody bowel movements and low blood pressure.[8] They should

---

[3] Hardy's blood pressure dropped into the 30s, which means he was in shock.

[4] Hardy's wife testified that on the morning of the 29th, Hardy was passing "pure blood" into the toilet. 4/3/12 Tr. at 164; *see also* Hardy Tr. at 14 ("every time they would help me get out of the bed to use the bathroom, all I did was just fill the commode up with solid bright red blood").

[5] Hardy received eight units of blood between July 27 and 29, then another four units after his hemicolectomy.

[6] The ileostomy was reversed on November 12, 2007.

[7] The defendant's expert testified that in his belief and subject to his "faulty" memory, hemoclips were just "coming onto the market" in 2007 such that he "had some minor experience with them but nothing to the extent that we do today." Chobanian Tr. at 27-28. The thrust of this argument was that hemoclips were not sufficiently in use at that time to hold the doctors liable for not using them. That argument is not persuasive because the VA team had in its possession and attempted to use hemoclips on Hardy on July 29, after he had been bleeding for two days. By then, though, the hemoclips could not work because inflammation had set in during the delay.

[8] The government's expert agreed that the 48-hour period of observation could have been shortened.

have conducted an angiography on the 28th, a procedure which would have been less invasive than the eventual surgery, less risky, and more likely to stop the bleeding. With either hemoclips on the 27th or an angiogram on the 28th, the VA team would have resolved the bleed and eliminated the need for the hemicolectomy.

At trial, the government's expert had a less-than-persuasive explanation for why the VA's observation of Hardy was acceptable. Here is the relevant section of the expert's cross-examination:

> [Plaintiff's counsel:] Talking about failure to monitor the urinary which is a good way of checking. Is that correct?
> [Defense expert:] It's one way of monitoring profusion, yes.
> Q: And failure to take concerns particularly on the 27th when you're losing four and you come back in on the 28th and you lose another four units of blood?
> A: In hindsight.
> Q: In hindsight or even regular sight.
> A: Not necessarily.
> Q: Eight pints of blood out of 10 is a lot of blood out of a person. Isn't it?
> A: <u>There are more factors to consider, such as it's a Saturday.</u> You don't have a full staff.
> Q: Oh?
> A: Secondly --
> Q: That's what I'm getting at.
> [Defense counsel:] Your Honor?
> [Plaintiff's counsel:] I'm sorry for interrupting. Go ahead. I apologize.
> A: Your staff is not there in the hospital. They are at home. You have to call in that staff. Secondly, the procedures are not without risk, particularly in somebody who may be hemodynamically unstable. He is bleeding intermittently. If you have to sedate him again, that may cause his blood pressure to drop. So you have to individualize. That's why there is no hard and fast rule about how to treat these patients in toto. You have to look at the individual and defer to the doctor who is there to make that decision.
> Q: And defer to the system that doesn't put on the staff on Saturday?
> A: I'm sorry?
> Q: And defer to the system also that doesn't have a complete staff on Saturday?
> [Defense counsel:] Object to argumentative, Your Honor.
> THE COURT: Objection overruled. You may repeat your question.
> A: I don't know the details, but I know from working even at places renowned as Bethesda Naval Hospital, your staff is not full on the weekends or holidays or nights. <u>You have a skeleton crew.</u>
> Q: And that's what I'm saying. You have to defer to that also to put that into account?
> A: Absolutely.

3

Chobanian Tr. at 89-91 (emphasis added). This line of reasoning is unavailing in our case because there was ample time for the VA to discover the bleed and call its staff.[9]

### 2. Who performed the procedure?

While the above findings are relatively straightforward, it is more difficult to identify who actually performed the colonoscopy and took the biopsy that led to Hardy's injuries. The question was thought to be important because Dr. McNeese, who the medical records show performed the procedure, was a new fellow alleged to have performed fewer than 10 colonoscopies and to have been unqualified to perform the procedure or take a biopsy by himself. If the plaintiff could prove either one of those allegations, it may be an independent breach of the standard of care.

For his part, Hardy claims he was awake during the procedure and saw Dr. McNeese perform the colonoscopy alone, cut Hardy, and then call for Dr. Azzouz, the supervisor. Mrs. Hardy testified that Dr. McNeese later came out of the procedure room and told her, "I cut him." Plaintiff's counsel claim that the medical records confirm that Dr. McNeese performed the colonoscopy.

The government's post-trial brief argues that "Mr. Hardy's reliance on the colonoscopy report is misplaced" and "flawed." It relies upon Dr. McNeese's testimony that he advanced the colonoscope for three to five minutes before passing it off to Dr. Chris Abrasley, who then passed it off to Dr. Azzouz, who ultimately took the biopsy that led to Hardy's injuries. Dr. McNeese said the medical records showed his name so that he could get credit for the procedure toward a fellowship quota. Defense counsel later added that "[a] physician's priority should be the care of his patients, not documentation in anticipation of litigation."

One of a physician's duties is to ensure the accuracy of the information he places in the medical records of his patients. Although medical providers use many tools to assess patients, they also review a patient's medical records/chart – not because they anticipate litigation, but because the records provide vital information which aids the providers in deciding a course of treatment. As explained by one source:

> Hospitals and other providers keep patient medical records to document the treatment given a patient, the plan of future treatment, and communication between the patient's physician and other providers treating that patient. The record is a data

---

[9] Needless to say, if the VA is ill-equipped to identify continued internal bleeding on a Saturday, perhaps it should reconsider its practice of conducting colonoscopies on Fridays.

4

> base containing factual information about a patient's health status and recording medical opinions based on that information. It is an essential part of a patient's continued treatment. . . . An institutional failure to keep proper records may be malpractice, if treating physicians lack essential information and as a result incorrectly treat a patient.

Furrow et al., Health Law 140 (1995) (citations omitted).

It is frustrating that the VA argues that its own medical records do not fully and accurately state who performed Hardy's procedure. The dispute has injected uncertainty into what should have been a simple question. It has also opened the door to human error. *Id.* at 144 ("By the time an action comes to trial, memories may have dimmed as to what actually occurred at the time of patient injury, leaving the medical record as the most telling evidence."). For example, it was not credible for Dr. McNeese to testify on direct examination that he remembered doing Hardy's procedure for three to five minutes, but then on cross-examination deny having any other specific memory from that day and fall back on the records. The records cannot be correct at all times except the one time they are conveniently incomplete.[10]

The government has further argued that Hardy could not possibly have been alert throughout the colonoscopy because of the medications he had been given.[11] The testimony was not entirely supportive of this point. For example, one VA nurse said Hardy had received light sedatives and was alert and awake during the procedure. And while Dr. Azzouz explained that the two drugs were (1) a narcotic that helped with pain control, and (2) a sedative that causes drowsiness, decreases alertness, and interferes with memory, the evidence did not conclusively establish that Hardy could not have observed and remembered what happened to him. And yet, as will become clear in a moment, some aspects of Hardy's testimony on damages were sufficiently called into doubt.

---

[10] In contrast, some of Hardy's memories are more credible, in part because events before the procedure had put him on guard and heightened his alert to everything that was happening during the procedure. For example, when Dr. McNeese introduced himself to Hardy, said he would be doing the colonoscopy, and gave Hardy forms to sign, the doctor joked that "when you sign here, this says I get everything." 4/3/12 Tr. at 218 (testimony of Dr. McNeese). Hardy was offended and rebuked McNeese, telling him this was a serious procedure and warning him to be careful. McNeese later wrote Hardy a letter apologizing for his "insensitive and inappropriate comment." PX-5.

[11] During this discussion, counsel for the defendant sought to introduce pages from the Physician's Desk Reference (PDR) to explain several of the relevant drugs' properties. The Court agrees it is appropriate to take judicial notice of the PDR, but in this instance has not relied upon the proffered pages to prove or disprove what happened during the procedure, instead placing more weight upon the credible testimony of Mrs. Hardy.

The most credible testimony on this issue came from Mrs. Hardy. While she was not present during the colonoscopy and therefore could not speak to who performed the procedure, she stated that Dr. McNeese approached her afterward and admitted that he "cut" her husband. That supports that Dr. McNeese took the biopsy – and is consistent with the medical records.

At the same time, while Dr. McNeese arguably should not have taken the biopsy given his relative inexperience, the Court has previously found that the taking of the biopsy in and of itself was not a breach of the standard of care. As a result, Dr. McNeese's biopsy was technically harmless, since the negligence in this case occurred when the VA team led by Dr. Azzouz failed to stop the bleed and the VA team in the MICU failed to appropriately monitor Hardy over two days of continued bleeding, causing pain, additional procedures, and permanent injury to his colon.

When placed in context, then, the question of which medical provider treated Hardy up to the point where Hardy began to bleed does not have the significance it was accorded by the parties at trial. The Court will move on to consider whether Hardy adequately proved any damages.

**B.     Damages**

Hardy co-owned and ran Hardy Brothers Paint and Body Shop for approximately 30 years. His work required significant physical labor, such as crawling under vehicles and moving and lifting very heavy objects and machines. Hardy also engaged in a fair amount of physical labor for fun and for family: he fished, rode a motorcycle, and worked in his yard, among other things.

Hardy claims that the colonoscopy and subsequent surgeries changed all of that. He testified that he could not work for seven months, and that when he returned, he was mostly limited to clerical, non-physical labor because of stomach and groin pain. He could not perform his usual heavy labor, vocational expert Kathy Smith confirmed, because it required lifting items "greatly in excess of 50 pounds on a regular basis," when Hardy's capacity was restricted to lifting items under 10 pounds. Smith Tr. at 19. For at least a two-week period immediately after the procedure, he could not drive.

Tax returns confirm that Hardy Brothers' revenues declined, but whether that was due to Hardy's injuries or was instead the result of Hardy and his brother gradually working less over time was disputed. Regardless, the business closed its doors at the end of 2009.

Outside of work, Hardy's post-surgery pain continued well after his release, Hardy said, and there was burning and substantial inconvenience over the 3.5 months during which he wore an

ileostomy bag. His wife described how Hardy was more depressed and tired, would cry, had problems lifting objects, and suffered reduced sexual function after July 2007. He also could not perform the yard work he previously took pleasure in.

The government responded that some of Hardy's symptoms – depression, PTSD, and reduced sexual function – were documented in Hardy's medical records before the colonoscopy in question. Hardy also had arthritis before he was injured at the VA, which may have contributed to his reduced mobility, the government asserted. It added that many of Hardy's other claimed symptoms were not documented in any of his post-procedure medical records, at least until he filed this lawsuit. Although Hardy may have been more depressed and his sexual function reduced even more, in several years of medical records he reported no pain, no loss of enjoyment of life, no taking over-the-counter medications, no diarrhea, no groin pain, no link between anemia and his hemicolectomy, and no need for or participation in physical therapy. Hardy's credibility was thus successfully called into question.

The government emphasized that on November 29, 2007, four months after the colonoscopy and two weeks after the ileostomy reversal, Dr. Beck directed Hardy to resume normal activity. On the other hand, Dr. Beck did not know the nature of Hardy's employment. Dr. Beck's statement allowed Hardy to do the usual tasks of a man Hardy's age, but was not necessarily an endorsement of returning to the heavy manual labor Hardy was accustomed to performing.

Considering all of this conflicting evidence, the Court finds that Hardy's various procedures and injuries did negatively impact his earning capacity, and agrees with that part of his testimony and the vocational expert's testimony that Hardy could not return to his previous work because it was substantially more physically demanding than his post-injury body could tolerate. The more difficult question is how to measure his damages.

### 1. **Lost wages**

Hardy Brothers' corporate tax returns indicate that from 2004-2006, Jack Hardy's annual wages averaged $35,042. In 2007, 2008, and 2009, however, he made $17,400, $31,175, and $29,000, respectively. A proper amount of damages for lost wages in these years is the difference between his average wages and his actual wages: $17,642 for 2007, $3,867 for 2008, and $6,042 for 2009. This totals $27,551. This sum will be awarded as a reasonable measure of the impact of Hardy's injuries on his earnings.

7

Hardy also seeks lost wages from having to close his business prematurely, arguing that he wanted to work for several additional years for retirement. Those damages cannot be awarded because the anticipated closure date of the body shop is too speculative to reasonably determine. That is especially true where there is a long-term, gradual decline in Hardy Brothers revenues and the national economy suffered a substantial setback in the years in question, the combination of which could have caused the business to close as easily as the VA's negligence. Based on the evidence, the Court cannot find by a preponderance of the evidence that the decline in the revenue of the business was sufficiently linked to Hardy's injuries and his inability to provide services to the business.

### 2. Lost Social Security benefits

Hardy's vocational expert attempted to give evidence about the Social Security income Hardy lost by taking those benefits eight years earlier than he desired. She was not qualified to make that calculation, however, and her report was admittedly imprecise on that calculation. No award will be made for lost Social Security benefits.

### 3. The ileostomy reversal

The parties dispute who should pay the $14,522 cost of Hardy's November 2007 ileostomy reversal, which was performed at Ochsner Health System in New Orleans. Although senior officials at the VA originally agreed to pay for it and approved relevant paperwork, the government now asserts that because the procedure was not connected to his military service, Hardy should have billed his family's private insurance for the procedure. Hardy failed to disclose that other insurance on relevant paperwork.

Neither party has behaved admirably here. Hardy should have disclosed the presence of other insurance when he was asked. And the VA should have kept its promise to pay for the procedure, to, as the VA's Chief of Staff put it in his deposition testimony, "get[] things put back together the way they were supposed to be" the first time. Kirchner Tr. at 23.

Had Hardy's insurance paid for the reversal, it would have been entitled to a lien on any recovery in this suit, since it expended money on a procedure necessitated by the VA's negligence.

Thus, either way, the VA would have to pay for the procedure. Hardy will receive the $14,522.[12] As a result, economic damages in this case total $42,073.

        **4.      Non-economic damages**

Hardy plainly suffered while bleeding at the VA for two days. He repeatedly passed fresh red blood during bowel movements, was cold and weak, and experienced a distressing period of vomiting a mixture of blood and GoLYTELY while preparing for his colonoscopy on day three. He feared that the VA's continued inattention would result in his death. Subsequent procedures necessitated by the bleed caused Hardy to lose half of his colon, have to live with an uncomfortable ileostomy bag for several months, undergo an ileostomy reversal, and deal with substantial pain and inconvenience.

It is self-evident that any person would be physically and emotionally affected after such a traumatic event and invasive surgery removing half of his colon. Obviously, there was pain or discomfort associated with undergoing the hemicolectomy and ileostomy, followed by the ileostomy reversal – procedures which should not have been necessary had the bleed been stopped on day one. There also was substantial inconvenience associated with the ileostomy bag, as its contents occasionally leaked, burned Hardy's skin, and spilled into his bed at night. Given all of these events, a reasonable award of non-economic damages is appropriate.

The medical records, though, do not well-document the full extent of the symptoms and pain Hardy claims to have suffered after his procedures. The government also effectively impeached Hardy by showing numerous inconsistencies between his claimed symptoms and the medical records, which suggested that many of his symptoms predated the VA's negligence. While the undersigned is not persuaded that the events at the VA did not at least aggravate Hardy's painful symptoms, the burden was on Hardy to prove the relationship between the negligence and his symptoms, not the government to disprove them. As a result, some of his alleged long-term pain and suffering cannot be substantiated to a degree sufficient to award damages.

"Any amount to be awarded for pain and suffering depends upon a Court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation."

---

[12] Hardy claims that the government is not entitled to a setoff because it did not produce certain documents before trial. The objection is moot.

9

*Papale v. United States*, No. 1:09-cv-611, 2011 WL 831180, *6 (S.D. Miss. Mar. 3, 2011) (citations omitted). "[A]ssigning a dollar value to non-economic damages is an imprecise manner." *Darby v. United States*, 878 F. Supp. 2d 692, 699 (N.D. Miss. 2012).

Awards for non-economic damages in FTCA cases in this judicial district obviously vary. *See, e.g.*, *Papale*, 2011 WL 831180, at *6 (awarding approximately $160,000 in non-economic damages in a neck and back injury case); *West v. United States*, No. 3:07-cv-581, 2009 WL 2169852, *7 (S.D. Miss. July 20, 2009) (awarding, in medical negligence case against the Jackson VA, $500,000 in non-economic damages to 89-year-old plaintiff for "extreme physical and emotional pain and distress" associated with the loss of vision for his last two years of life, noting that "but for the statutory cap, the court . . . would have been inclined to award more than $500,000"); *Spaulding v. United States*, No. 1:05-cv-221, 2006 WL 2882203, *4 (S.D. Miss. Oct. 5, 2006) (awarding $20,000 in non-economic damages in a back pain case where the government's negligence exacerbated plaintiff's preexisting condition); *Adams v. United States*, No. 3:04-cv-313, 2006 WL 1994860, *9 (S.D. Miss. July 14, 2006) (awarding $25,000 for shortness of breath, swelling, and anxiety); *Crow v. United States*, No. 3:96-cv-731, Docket No. 44, at *21 (S.D. Miss. Jan. 20, 1998) (awarding $550,000 in non-economic damages where the government's negligence rendered the plaintiff totally disabled); *Byrd v. United States*, 945 F. Supp. 968, 979 (S.D. Miss. 1996) (awarding $80,000 for pain and suffering to a plaintiff experiencing extreme back pain) (construing Alabama law).

The universe of cases to which this Court must look, of course, extends beyond FTCA cases. Verdicts, whether rendered by juries or judges, that are affirmed by the Mississippi appellate courts also provide valuable insight into assessing the amount of non-economic damages that should be awarded in this case. Mississippi courts have approved various multipliers of the medical expenses or other economic damages to the non-economic damages, to guide their view of the appropriateness of non-economic damages awards. *See, e.g.*, *Delta Regional Med. Ctr. v. Venton*, 964 So. 2d 500, 507 (Miss. 2007) (affirming trial judge's $1 million damages award where plaintiff with bedsore experienced "substantial pain and suffering" for fewer than three months before her death, in Mississippi Tort Claims Act case); *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 928-29 (Miss. 2006) (affirming trial judge's $591,597 award for pain and suffering and permanent physical impairment to plaintiff's leg, in MTCA case); *Thompson v. Lee Cnty. School Dist.*, 925 So. 2d 57,

58-59 (Miss. 2006) (affirming trial judge's total award of $200,000, or four times the medical expenses incurred, in MTCA case); *Miss. Dep't of Public Safety v. Durn*, 918 So. 2d 672, 673 (Miss. 2005) (affirming trial judge's non-economic damages award of $148,000, or 12 times the medical expenses incurred, in MTCA case); *Gatewood v. Sampson*, 812 So. 2d 212, 223 (Miss. 2002) (affirming jury verdict of $308,000, or almost 100 times medical expenses incurred, for gunshot victim who suffered from headaches, soreness, depression, dizziness, lost sleep, and recurring nightmares); *Purdon v. Locke*, 807 So. 2d 373, 378 (Miss. 2001) (affirming jury award of $450,000 for pain and suffering in medical negligence case resulting in severe soreness and discomfort); *City of Jackson v. Perry*, 764 So. 2d 373, 380 (Miss. 2000) (affirming trial judge's $100,000 award for pain and suffering, or more than nine times medical expenses incurred, in MTCA case); *Delta Regional Med. Ctr. v. Taylor*, No. 2011-CA-413-COA, 2012 WL 3932734, *6 (Miss. Ct. App. Sept. 11, 2012) (affirming trial judge's $390,000 award for permanent physical impairment, partial loss of use of full body function, loss of earning capacity, pain and suffering, and emotional distress, in medical negligence case brought under the MTCA); *Circus Circus Mississippi, Inc. v. Cushing*, No. 2011-CA-00961-COA, 2012 WL 3932729, *9 (Miss. Ct. App. Sept. 11, 2012) (affirming jury verdict of $250,000, or 37 times medical expenses incurred, where plaintiff slipped, fell, and broke her elbow); *Kroger Co. v. Scott*, 809 So. 2d 679, 682, 684 (Miss. Ct. App. 2001) (affirming jury verdict of $74,000, or 45 times medical expenses incurred, where slip and fall plaintiff suffered fractured ankle).

The Court finds that the VA's negligence caused Hardy to suffer pain, mental anguish, inconvenience, and other nonpecuniary damages permitted by Mississippi law, but that the VA is not responsible for the full amount of non-economic damages ($500,000) sought in this suit. A reasonable award of non-economic damages in this case is $375,000.

## II. Conclusions of Law

This Court has personal jurisdiction over the parties and subject matter jurisdiction over this dispute. *See* 28 U.S.C. § 1346(b)(1).

Pursuant to the Federal Tort Claims Act (FTCA), *id.* §§ 1346(b), 2671-2680, the Court applies the law of the state where the tort occurred, which in our case is Mississippi. *See id.* § 1346(b)(1); *Pesantes v. United States*, 621 F.2d 175, 179 (5th Cir. 1980). Under Mississippi law,

> [t]he essential elements of a medical-malpractice claim are: (1) the existence of a

11

duty on the part of a physician to conform to the specific standard of conduct, (2) the applicable standard of care, (3) the failure to perform to that standard, (4) that the breach of duty by the physician was the proximate cause of the plaintiff's injury, and (5) that damages to the plaintiff resulted.

*Patterson v. Tibbs*, 60 So. 3d 742, 753 (Miss. 2011) (citation omitted). "When loss is realized, but the extent of the injury and the amount of damage are not capable of exact and accurate proof, damages may be awarded if the evidence lays a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage." *Warren v. Derivaux*, 996 So. 2d 729, 737 (Miss. 2008) (quotation marks, citation, and emphasis omitted).

It is undisputed that the medical providers at the VA had a duty to comply with certain standards of care, discussed above, in remedying a bleed created during Hardy's colonoscopy. The medical providers breached these duties, causing Hardy to suffer physical, emotional, and professional damages that can be fairly and reasonably calculated.

Hardy provided the government with a proper Notice of Claim pursuant to 28 U.S.C. § 2675(a), thereby exhausting his administrative remedies. All conditions precedent to entry of judgment in Hardy's favor have been satisfied.

As a result of the government's breaches causing Hardy damages, he is entitled to judgment against the government in the amount of $42,073 in economic damages and $375,000 in non-economic damages.

### III. Order

For the foregoing reasons, the Court finds in favor of plaintiff Jack Hardy in the amount of $417,073. A separate Final Judgment will issue this day. The parties have 28 days to file post-trial motions, if any.

**SO ORDERED**, this the 25th day of March, 2013.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE